**CARE PROVIDERS OF MINNESOTA, INC., et al., Appellants,**

v.

**Commissioner Maria GOMEZ, Minnesota Department of Human Services, Respondent.**

No. C9–95–2012.

Court of Appeals of Minnesota.

March 19, 1996.

Susan M. Voigt, Rosemary Tuohy Siegel, Brill, Greupner & Duffy, P.A., Minneapolis, MN, for appellant.

Hubert H. Humphrey, III, Attorney General, John L. Kirwin, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by PARKER, P.J., and SCHUMACHER and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Wedgewood Health Care Center, Inc., and EWL Enterprises, Inc., d/b/a Golden Oaks Nursing Home (the providers), appeal the district court's denial of declaratory and permanent injunctive relief against the Minnesota Department of Human Services (DHS).[1] We affirm.

## FACTS

DHS administers Minnesota's participation in the federal Medicaid funding program for long-term and intermediate health care facilities. The federal share of the funding is approximately 55 percent.

Medical assistance providers are reimbursed at a rate that is established each year for each facility. DHS initially approves a provider's rate based on a desk audit (a quick, paper review) of the provider's reported costs. Later, a DHS field audit (a more intense, on-site examination of records) may disallow certain costs claimed by the provider. Absent appeal, the provider must repay the disallowed costs.

If a provider appeals a field audit, the DHS Commissioner reviews the audit and issues a written determination. A provider can appeal this written determination by demanding a contested case hearing.

In 1993, the Office of the Inspector General (OIG) of the United States Department of Health and Human Services conducted an inspection audit of DHS's claimed Medicaid costs. The audit focused first on whether DHS properly identified overpayments to care facilities and second on whether DHS timely reimbursed the federal government for overpayments. The OIG report concluded that DHS had "unnecessarily delayed"

refund of the federal share of overpayments until all appeal procedures were exhausted. This DHS practice was found to be "contrary to Federal regulations."

In response to the OIG report, DHS proposed that it begin paying back the federal share of overpayments on the date the written determination was issued. The federal auditor agreed to such an arrangement, and DHS has begun issuing immediate assessment letters to providers that requested a contested case hearing; the letters are sent long before appeal procedures are completed.

Golden Oaks and Wedgewood, nursing homes that participate in the medical assistance program, commenced contested cases to appeal DHS audits for rates paid from 1989 to 1993. At issue in the appeals is the allowance of extraordinary bonuses paid to the nursing homes' owners. DHS issued assessment letters to the nursing homes indicating that reimbursement of the federal share of the alleged overpayments was due immediately, $254,165 for Wedgewood and $35,932 for Golden Oaks.

The providers, along with Care Providers of Minnesota, Inc. (their trade association), initiated this suit to enjoin DHS from recovering the federal overpayments before resolution of the contested case hearings. The district court initially issued a temporary restraining order against the new DHS procedure but, following a hearing, dissolved the temporary restraining order and denied the providers' motion for declaratory and permanent injunctive relief. This appeal followed.

## ISSUES

I. Does Minn.Stat. § 256B.0641 require DHS to recover the federal share of overpayments from a provider when the federal government recovers its share from DHS, even before the provider's appeal of the alleged overpayment has been resolved?

II. Do DHS assessment letters for the federal share of alleged overpayments constitute unpromulgated rules?

---

1. Care Providers of Minnesota, Inc., a trade association of approximately 250 nursing homes, is also a party appellant.

## ANALYSIS

■ In this case, the district court's denial of an injunction was based on its interpretation of a statute. The construction of a statute is a question of law and is reviewed de novo. *Sorenson v. St. Paul Ramsey Medical Ctr.*, 457 N.W.2d 188, 190 (Minn.1990). It is appropriate to defer to DHS's interpretation of its governing statute. *See Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn.1979) (when meaning of governing statute is doubtful, courts should give great weight to interpretation by department charged with its administration).

### I.

■ Minn.Stat. § 256B.72 (1994) provides:

The commissioner shall not recover overpayments from medical assistance vendors if an administrative appeal or judicial action challenging the proposed recovery is pending.

Pursuant to this provision, prior DHS practice was to defer attempts to recover an overpayment from a provider until the provider's appeal of an overpayment claim was resolved. But:

Notwithstanding section 256B.72 or any law or rule to the contrary * * *

(1) if the federal share of the overpayment amount is due and owing to the federal government *under federal law* and regulations, the commissioner shall recover from the medical assistance vendor the federal share of the determined overpayment amount paid to that provider using the schedule of payments required by the federal government; * * *.

Minn.Stat. § 256B.0641, subd. 1 (Supp.1995) (emphasis added). Thus, despite Minn.Stat. § 256B.72, state law requires DHS to recoup from the provider the federal share of overpayments as soon as the state refunds that share to the federal government.

Federal regulations, enjoying supremacy, set the following schedule for payment:

[T]he Medicaid agency has 60 days from the *date of discovery* of an overpayment to a provider to recover or seek to recover the overpayment before the Federal share must be refunded * * * whether or not the State has recovered the overpayment from the provider.

42 C.F.R. § 433.312(a) (1993) (emphasis added). The regulations then explain:

An overpayment resulting from a situation other than fraud or abuse is discovered on * * *

(1) The date on which any Medicaid agency official or other State official first notifies a provider in writing of an overpayment and specifies a dollar amount that is subject to recovery.

42 C.F.R. § 433.316(c) (1993).

The providers contend that it is improper to use the date the written determination is issued as the "date of discovery" in instances in which they demand a contested case hearing. The providers point to Minnesota's statutory language:

When a contested case demand is referred to the office of the attorney general, the contested case procedures described in subdivision 1c apply and the written *determination issued by the commissioner is of no effect.*

Minn.Stat. § 256B.50, subd. 1h(d) (1994) (emphasis added). According to the providers, if state law says the written determination has "no effect," it is illogical for it to serve as the discovery date triggering the 60–day period for reimbursing the federal share of payments.

We conclude, however, that this statute is inconsistent with, and thus superseded by, federal regulations. Those regulations provide that "[a]ny appeal rights extended to a provider do not extend the date of discovery." 42 C.F.R. § 433.316(h) (1993). The "no effect" language in the state statute cannot negate the discovery date imposed by this federal rule.

The providers also point to Minn.Stat. § 256B.50, subd. 1c (1994), which states:

Regardless of any rate appeal, the rate established must be the rate paid and must remain in effect until final resolution of the appeal or subsequent desk or field audit adjustment, notwithstanding any provision of law or rule to the contrary.

We conclude, however, that section 256B.0641, which explicitly requires DHS to recoup overpayments paid to the federal government promptly, even if an appeal is pending, is controlling. We note that the quoted portion of section 256B.50, subdivision 1c, was enacted in 1983 [2] and was on the books in 1985 when the legislature adopted the law explicitly requiring DHS to recover the federal share of overpayments even if an appeal is pending.[3] *See* Minn.Stat. § 645.26, subd. 4 (1994) (when laws are irreconcilable, law enacted most recently prevails).

The providers next cite to cases holding that under federal law, the federal government may recoup its share of overpayments whether or not the state has collected these amounts. *See, e.g., Department of Social Servs. v. Bowen,* 804 F.2d 1035, 1041 (8th Cir.1986) (Department of Health and Human Services may recover from state social service agency overpayments made to nursing homes regardless of whether state agency collected such payments from nursing homes); *Perales v. Heckler,* 762 F.2d 226, 227 (2d Cir.1985) (state must return to Department of Health and Human Services federal share of unrecovered overpayments regardless of state's ability to recoup such overpayments). The issue at this point, however, is not federal law, but whether Minnesota law requires DHS to recover from providers the federal share of overpayments as soon as federal law has compelled reimbursement. We conclude that it does, and cases holding that the federal government may collect funds from a state before the state has recouped from the providers do not affect our analysis. Minnesota law now avoids that result by accelerating DHS's recovery of overpayments to match the federal payment schedule.

## II.

■ The providers argue that DHS's recent practice of issuing "informational rate determination" letters is a new interpretation of the statute and results in an invalid, unpromulgated rule. DHS's use of these assessment letters is, however, merely a means of effectuating its interpretation of existing law and does not involve the promulgation of a new rule. *See Mapleton Community Home, Inc. v. Dep't of Human Servs.,* 391 N.W.2d 798, 801 (Minn.1986) (ratio adopted by DHS to aid in calculating reimbursement rate by translating existing rule from words to numbers not unpromulgated rule). Moreover, the providers have not shown that they have been prejudiced by DHS's failure to promulgate a rule. The providers do not claim that they would have acted differently with notice of pending adoption of a new rule.

## III.

The providers argue that it is possible for DHS to resolve the contested cases before the overpayment is due to the federal government. This argument is purely speculative. There is no evidence in the record showing that the entire contested case process—including discovery, prehearing matters, hearing, administrative law judge's report and recommendation, and Commissioner's final decision—could be completed before the overpayment recovery is due the federal government.

## DECISION

Federal law imposes on Minnesota the reimbursement schedule it must follow. Minn. Stat. § 256B.0641 requires DHS to recoup the federal share of overpayments contemporaneously with payment to the federal government, regardless of the status of a provider's appeal. DHS's use of the informational rate determination letter is not an unpromulgated rule and has not prejudiced the providers. It would be speculative for this court to determine that DHS can comply with state law while delaying recovery of the overpayments until providers' appeals are resolved.

**Affirmed.**

---

**2.** 1983 Minn. Laws ch. 199, § 15.

**3.** 1985 Minn. Laws 1st Spec. Sess. ch. 9, art. 2 § 39 (codified at Minn.Stat. § 256B.0641).